At the time of the occurrence of the events on which this suit is based, defendant, George W. Stem, was engaged in what is known as the "finance business" in New Orleans, making loans on furniture, automobiles and other securities and conducting his business under the name "Old Reliable Finance Company."
Plaintiff, Saul Harris, on November 22, 1940, borrowed from Stem $420.12, and, as security for the loan, granted a chattel mortgage on a 1936 Model, four-door Oldsmobile sedan and certain household furniture. The loan was to be repaid in installments, most of which at the time of the occurrences referred to, had been paid. Before the loan was paid in full, Harris was called into the Military Service of the United States and was sent to Camp Adair, Oregon, departing from New Orleans with his wife and leaving the automobile, together with the ignition and other keys, in the custody of a friend, Mrs. Mallie Driscoll.
In this suit Harris alleges that in his absence, and without authority from him, and illegally and without resorting to judicial process, Stem, through his agents and employees, illegally seized and took into his possession the said automobile and has since failed and refused to deliver it to plaintiff. He prays for damages, fixing the value of the automobile at $500 and praying for an additional $500 "for the unlawful and illegal seizure and the breach of your plaintiff's right * * *."
Stem filed answer admitting that he had made the loan and had been granted the mortgage referred to, averring that the loan had been paid in full, and denying all plaintiff's allegations concerning the seizure of the automobile.
In the Civil District Court for the Parish of Orleans there was judgment for plaintiff in the sum of $500, with interest from judicial demand, and defendant has appealed.
In this court, defendant-appellant filed a plea of prescription of one year. We shall first consider this plea. *Page 891 
It is shown that plaintiff was notified by Mrs. Driscoll during January, 1943 that the car had been seized a short time prior thereto. Plaintiff did not file this suit until March 21, 1944, and defendant contends that since more than one year elapsed between the time at which plaintiff learned of the seizure and the time at which he filed the suit, prescription of one year has accrued.
[1] It is true that the prescription of one year is applicable to a suit of this kind. See Civil Code, Arts. 3536,3537; Martenis v. American Rice Milling Co., La. App., 178 So. 206; McGuire v. Monroe Scrap Material Co., et al., 189 La. 573,180 So. 413.
[2] Plaintiff, in an effort to avoid the effect of the plea of prescription shows that he was in the Military Service of the United States until November, 1943, and he points to the Soldiers' and Sailors' Civil Relief Act of the United States, as amended, being an act of October 17th, 1940, particularly as amended by an act of October 6th, 1942, 50 U.S.C.A.Appendix, § 501 et seq., and calls attention to Section 205 of that Act which reads as follows:
"The period of military service shall not be included in computing any period now or hereafter to be limited by any law, regulation, or order for the bringing of any action or proceeding in any court, board, bureau, commission, department, or other agency of government by or against any person in military service or by or against his heirs, executors, administrators, or assigns, whether such cause of action or the right or privilege to institute such action or proceeding shall have been accrued prior to or during the period of such service, nor shall any part of such period which occurs after the date of enactment of the Soldiers' and Sailors' Civil Relief Act Amendments of 1942 be included in computing any period now or hereafter provided by any law for the redemption of real property sold or forfeited to enforce any obligation, tax or assessment."
Counsel for defendant maintain, however, that plaintiff cannot claim the benefit of the said statute, extending the time within which he might bring this suit, and as supporting his contention that the statute has no application here, points to a document which was executed by the plaintiff and his wife on October 2, 1942, which reads as follows:
"New Orleans, La., Oct. 2, 1942
"For and in consideration of a loan granted to me by the Old Reliable Finance Company upon movable property and furniture and which said loan is secured by a chattel mortgage dated Nov. 12th, 1940 in the sum of and as a further inducement to them to grant said loan and in order to secure them in the event of my failure to pay said loan and in order to save unnecessary and excessive court costs which would result from a seizure, I do hereby transfer, abandon and subrogate all my right, title and interest in and to said movable property and furniture unto the said Old Reliable Finance Company, said movable property and furniture to be delivered by me immediately upon demand, without notice and without resorting to Court action to obtain said possession.
"The said Old Reliable Finance Company is authorized to sell said property upon such terms and conditions, without notice, at public or private sale as they may deem fit and proper. The net proceeds of the sale of the said property is to be credited to the amount due by me to the Old Reliable Finance Company and I further agree that should any difference exist in favor of the Old Reliable Finance Company after the sale of said property that I will, upon demand, pay said difference.
"It is also understood that this agreement is not a waiver by the Old Reliable Finance Company of any other rights or actions which they have or may have in this matter.
"(Sgd) Saul Harris "Elise Noto Harris"
"Witness:
"_____"
Counsel for Stem contend that by this document, or as a result of it, plaintiff waived all of his rights to any benefits which might otherwise have accrued to him under the Civil Relief Act referred to, and they maintain also that that act *Page 892 
authorized the execution of such a document.
As authority for this statement, counsel for defendant call attention to Section 107, as amended by the Act of October 6th, 1942, which, in certain particulars, permits the person who might otherwise be entitled to the benefit of the statute, to agree, in writing, that where money is borrowed on such security as was given here, the benefits of the act, that is to say the right to resist seizure so long as military service may continue, may be waived. And counsel contend that where there is such a waiver, the person in the service who executes the waiver, by it, abandons all rights of whatever nature or kind which might have been created by the said Civil Relief Act, and that therefore when Saul Harris and his wife executed the document which we have quoted, they waived all rights under the Act, including the right to contend that any prescription which might otherwise have run against them had been interrupted or suspended during the military service of Harris.
In the first place, it is shown that plaintiff received no consideration whatever for the execution of the so-called waiver and that the statement in the waiver that it was given "as a further inducement * * * to grant said loan" was absolutely and entirely without foundation. The loan had already been granted in full and there was no consideration whatever received by Harris or his wife for the execution of the so-called waiver.
[3, 4] More important still is the fact that by no stretch of the imagination can the provisions of the Civil Relief Act, which is relied on by counsel for defendant be construed as having the effect of waiving the right to extend a period of prescription so long as the person who might otherwise be protected by that feature of the act remains in the military service. The authority to grant such a waiver, if there is such authority in the statute, is in an entirely different section from that which provides for the interruption of prescription. We think it very clear that the Congress had no intention of providing that if the person in the military service should see fit to waive the benefits of the statute which might otherwise protect him against seizure during his military service, and to agree that such seizure might nevertheless be made, by doing so he deprived himself of all of the other benefits of the Act, including the right to claim that prescription which might otherwise accrue against him had been interrupted or suspended during his military service.
[5] Prescription was plainly interrupted during the service of Harris in the Armed Forces of the United States and his right to bring this suit continued in existence until one year from his discharge.
[6, 7] We refer again to the so-called waiver to say that defendant cannot rely upon it in any way as having given him authority to seize the car without judicial process because he did not make any such defense in his pleadings but, on the contrary, denied absolutely that the seizure was made or authorized by him. The only question then for our consideration is one of fact: Did defendant cause the seizure of the car? Defendant says that he did not. Mrs. Driscoll says, however, that several weeks after the departure of plaintiff and his wife, she saw two men drive up to the car which was in front of her home, and that they tried "to hook on to the bumper of the car that was parked, which I think the battery was dead. * * *"
She says that she walked to her front door and that "The big fellow came to the door and rang the bell and I opened the door and he asked if I had the key for that car, and I told him I did, and he said that he was from the Old Reliable Finance Company * * *." She said also that he showed her "some kind of small paper with Old Reliable Finance Company printed on it." She says that she concluded that possibly the plaintiff, Harris, had communicated with the Finance Company and possibly had asked the company "to look out for the both interest." She gave the keys to these two men and they took the car away.
She did not know the name of the "big fellow" but it appears that later he was identified as a Mr. Jorvis who is shown to *Page 893 
have been at that time in the employ of defendant, Stem.
Harris returned later and one day while he and Mrs. Driscoll were together in a nearby market, Mrs. Driscoll pointed out to him a large man whom she identified as the one who had taken the car. This man was identified as a Mr. Jorvis to whom we have just referred.
Stem admitted that Jorvis had been in his employ but he denied that he had had any authority to take the car. However, he did not place him on the stand as a witness, although he admitted that he could have found him and said that he could have been produced. In fact, he said:
"I can get him now in fifteen minutes on the telephone if you want."
His failure to produce Jorvis weighs heavily against him. The entire defense is based on the contention that the car was not taken by anyone connected with him, and that if it was taken by any such person, it was taken without his authority. Jorvis had been in the employ of Stem and was available to him — he should have produced him.
Furthermore, it appears that at the time of the alleged seizure there was a small unpaid balance due by Harris to Stem, and yet Stem now testifies that according to his books the account has been paid in full. He does not know who produced the money to pay the balance. It seems to us that it could only have been paid by the entry of credit from the sale of the car and if the car was not seized it could not have been sold.
It is quite true that Stem might not himself have been responsible for the taking of the car. He states that at that time there were some evidences of dishonesty in his office force, although he exonerates Jorvis from all responsibility. It is possible that someone in his employ knew of the balance due by Harris; knew that it was secured by mortgage on the automobile and knew that Harris had left the city and that the car was still here. Knowing this, a dishonest employee could have taken the car and sold it and could then have applied, out of the proceeds, a sufficient amount to retire the unpaid balance and then could have appropriated what was left. Possibly such a defense could have been accepted had it been alleged and proven but all that we have before us is the allegation that there was no such seizure of the car. But an employee of Stem called and, after identifying himself, made off with the car. All that Stem did to counteract the force of this evidence was to say that Jorvis could have been produced if the "plaintiff" wanted him. The plaintiff was not interested in producing Jorvis but Stem, himself, was vitally interested in securing from him testimony which would have explained his action in taking away the automobile.
[8, 9] When we come to consider the amount to which Harris is entitled, we find that the automobile in question was a 1936 model Oldsmobile sedan. It had been bought in 1940 for $400 cash and a traded in Chevrolet, which was valued at $135. Harris states that he had added $175 of improvements to the car. The seizure was in 1943. In addition to the value of the car, he is entitled to redress for the invasion of his rights. It is well settled that for an illegal seizure in a situation of this kind, damages are due. Under all the circumstances, considering the value of the car, the amount awarded below, $500, does substantial justice between the parties.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.
 *Page 19